# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

CITY OF RIVIERA BEACH POLICE PENSION FUND, individually and on behalf all others similarly situated,

               Plaintiff,

      v.

TARGET CORPORATION, BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR., GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, MELANIE L. HEALEY, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, AND DIMITRI L. STOCKTON,

               Defendants.

<u>CLASS ACTION</u>

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

Plaintiff City of Riviera Beach Police Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsels' investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Target Corporation ("Target" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Target; and (c) review of other publicly available information concerning Target.

## I.     INTRODUCTION

1.      This is a class action brought on behalf of persons and entities that purchased or otherwise acquired Target common stock between August 26, 2022 and November 19, 2024, inclusive (the "Class Period").  The claims asserted herein are alleged against Target and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 and 14a-9 promulgated thereunder.

2.      Target misled investors by making false and misleading statements about Target's Environmental, Social and Governance ("ESG") and Diversity, Equity, and Inclusion ("DEI") mandates that led to widespread customer boycotts following Target's 2023 LGBT-Pride campaign (the "2023 LGBT-Pride Campaign" or the "Campaign").  The negative effects of the Campaign on Target's business, including a subsequent campaign in 2024 (the "2024 Campaign"), led to a massive decline in Target's stock price.

3.      Specifically, the 2023 LGBT-Pride Campaign offended certain Target customers, provoking consumer backlash and boycotts that caused Target's sales to fall for the first time in

six years. Unbeknownst to investors, and contrary to Target's public statements, Target's Chief Executive Officer ("CEO") Brian C. Cornell ("Cornell") and its Board of Directors (the "Board") did not oversee or disclose the known risks of Target's 2023 LGBT-Pride Campaign and the 2024 Campaign. This deceit, through misleading statements in the Company's public filings, including its 10-Ks and proxy statements, caused Target's investors to purchase Target stock at artificially inflated prices and to unknowingly support Target's Board and management in their misuse of investor funds to serve political and social goals.

4.    As the truth of the negative effect of these campaigns came to light, Target suffered tens of billions of losses in its market capitalization from May 2023 through present. Beginning in May 2023 shortly after the Campaign was launched, Target's stock price suffered precipitous declines and has never recovered. For instance, on November 20, 2024, Target's stock price suffered a decline of 22% in one-day, wiping out $16 billion in market cap. Target reported disappointing earnings and guidance, as it continued to grapple with lingering effects of its ill-advised DEI campaigns that turned away customers, and apparently some customers for good. Target's performance during this period was in stark contrast to its main rival Walmart Inc. ("Walmart"), which demonstrated stellar performance during this same time frame, showing that at Target's underperformance was due to the continued backlash from its campaigns further eroding its profitability and damaging investors.

5.    Cornell and current and former members of Target's Board have violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder by making or causing Target to issue misleading statements to investors including that:

- Target's quarterly SEC filings and annual reports filed during the Class Period omitted that Target was subject to the risk of consumer boycotts because of its ESG/DEI initiatives like the 2023 LGBT-Pride Campaign;

- Target's 2023 Annual Proxy Statement (the "2023 Proxy") falsely and misleadingly stated that Target's Board and its committees (i) oversaw social and political issues and risks arising from Target's pursuit of ESG/DEI mandates, (ii) adopted Target's ESG/DEI mandates in order to enhance shareholder value, and (iii) proposed executive compensation plans that were aligned with shareholder value; and

- Target and its CEO & Board Chairman Cornell misleadingly downplayed the scope of consumer boycotts after they began.

## II.    PARTIES

### A.    Plaintiff

6.    Plaintiff City of Riviera Beach Police Pension Fund purchased Target common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein.  City of Riviera Beach Police Pension Fund is a pension fund that safeguards investments to fund the pensions and retirements of the City of Riviera Beach's police officers. Plaintiff's purchase of Target common stock during the Class Period is attached as Schedule A to the Certification of City of Riviera Beach Police Pension Fund, annexed hereto.

### B.    Defendants

7.    Defendant Target is a Minnesota corporation with principal executive offices at 1000 Nicollet Mall, Minneapolis, MN, 55403-2542.  Target's stock trades in an efficient market on the New York Stock Exchange (NYSE) under the trading symbol "TGT."  Target issued the 2022 Annual Report and the 2023 Proxy.

8.    Defendant Cornell has served as Target's Chairman and CEO at all relevant times. Defendant Cornell resides in Minnesota.

9.    Defendant Cornell, because of his position with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and

presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Defendant Cornell was provided with copies of the Company's reports and press releases alleged herein to be materially false prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Indeed, Defendant Cornell personally signed the annual reports, annual proxy statements, and other filings that contained the misstatements alleged herein. Because of his position and access to material non-public information available to him, Defendant Cornell knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false. Defendant Cornell is liable for the false statements pleaded herein.

10. Defendant David P. Abney is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Abney resides in Georgia.

11. Defendant Douglas M. Baker, Jr. is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Baker resides in Minnesota.

12. Defendant George S. Barrett is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Barrett resides in Ohio.

13. Defendant Gail K. Boudreaux is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Boudreaux resides in Indiana.

14. Defendant Robert L. Edwards is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Edwards resides in Idaho.

15. Defendant Melanie L. Healey is a former former Target director and was a Target director when Target issued the 2023 Proxy. Defendant Healey resides in Ohio.

16. Defendant Donald R. Knauss is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Knauss resides in Texas.

17.     Defendant Christine A. Leahy is a Target director and was a Target director when Target issued the 2023 Proxy.  Defendant Leahy resides in Illinois.

18.     Defendant Monica C. Lozano is a Target director and was a Target director when Target issued the 2023 Proxy.  Defendant Lozano resides in California.

19.     Defendant Grace Puma is a Target director and was a Target director when Target issued the 2023 Proxy. Defendant Puma resides in Florida.

20.     Defendant Derica W. Rice is a Target director and was a Target director when Target issued the 2023 Proxy.  Defendant Rice resides in Rhode Island.

21.     Defendant Dmitri L. Stockton is a Target director and was a Target director when Target issued the 2023 Proxy.  Defendant Stockton resides in North Carolina.

22.     The foregoing defendants referenced in paragraphs 8 through 21 are collectively referred to herein as the "Directors" or the "Individual Defendants."

## III.    JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Plaintiff and its beneficiaries are located in the State of Florida and suffered harm and damages in Florida from Defendants' fraudulent misconduct alleged herein.  Further, Defendant Target conducts business in this Judicial District.

26.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

5

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    CONTROL PERSON ALLEGATIONS

27.    By reason of the Individual Defendants' positions on Target's Board, including Defendant Cornell and his position as Target's Chairman of the Board and as CEO, the Individual Defendants possessed the power and authority to control the contents of Target's proxy statements and annual reports. The Individual Defendants were provided with copies of Target's proxy statements and had the ability and opportunity to prevent their issuance or cause them to be corrected.

28.    Because of their positions with Target, and access to material, nonpublic information available to them, but not to the public, the Individual Defendants, including CEO Cornell, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

## V.    FACTUAL ALLEGATIONS

29.    Target has long cultivated a classic, all-American image, and sells itself as the favorite retailer of middle class American families. But for years, Target's Board and management wasted Target's financial and reputational capital pursuing the Board's and management's personal ESG/DEI interests, while falsely and misleadingly portraying the risks of this strategy to Target's shareholders in order to artificially inflate Target's stock price and secure the Board's re-election.

30.    In May 2023, Target faced immense customer backlash to its ambitious LGBT-"Pride Month" marketing and sales campaign, one of its featured ESG/DEI initiatives. The 2023 LGBT-Pride Campaign prompted a strong adverse reaction from a large portion of Target's

customer base, in particular because it featured marketing and products directed to children, embroiling Target in a culture war.

31.      These risks were no surprise to Target's management. In 2016, Target became "the central battleground of a vitriolic national debate over transgender rights" after Target published an antagonistic response to North Carolina's transgender bathroom law. Several customer boycotts ensued, causing Target to forego millions of dollars in lost sales and revenue. Further, other companies like The Walt Disney Company and Anheuser-Busch InBev Worldwide, Inc. were experiencing high profile backlash to similar marketing initiatives.

32.      Shareholders, consumer groups, and conservative commentators repeatedly warned Target that its ESG/DEI initiatives and LGBT activism would cause it to lose customers. In response, Target assured investors that it was carefully monitoring for any social and political risks associated with its ESG/DEI initiatives.  In reality, the Board, both itself and through the applicable Board committees, only monitored risks it perceived from *failing to achieve its self-imposed ESG/DEI mandates*. These "risks" were *not* "social or political" risks of ESG/DEI mandates— neither according to Target's definition nor by how a reasonable investor would understand those words.   Instead they were risks associated with a select group of nonprofit-organization "stakeholders" that Target worked with to adopt its ESG/DEI mandates. These "stakeholder"-driven "risks" were a pretext for Target to adopt ESG/DEI mandates, not a good-faith oversight of the social and political risks of adopting ESG and DEI motivated corporate policies.

33.      Despite the evident risks to Target's ESG/DEI mandates and the Campaign in particular, Target failed to disclose that Target was subject to backlash from consumers because of its ESG/DEI mandates and the upcoming LGBT campaign, rendering misleading statements in Target's 2023 Proxy about Target's risks and risk oversight.

34.     The 2023 Proxy also misled investors by stating that Target's proposed executive compensation plans were aligned with shareholder value when, in reality, they included substantial incentive payments to executives for meeting ambiguous and subjective "DEI progress" mandates.

35.     In light of this misleading information, Target shareholders re-elected Target's Board at the 2023 election, turned down multiple proposals via shareholder vote to reform the Board's risk oversight functions, and approved executive compensation plans that incentivized Target's officers to implement DEI programs like the 2023 LGBT-Pride Campaign.

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     Defendants Cornell and Target Failed to Disclose Risk of Consumer Boycotts Caused by Its ESG/DEI Initiatives in Its Public Filings

#### 1.     Target's Forms 10-Q for the Quarters Ending July 31 and October 31, 2022

36.     On August 26, 2022 and November 23, 2022, Target filed its Form 10-Q for the quarterly periods ended July 31, 2022 and October 31, 2022, respectively.  Under the heading "Risk Factors," Target stated: "There have been no material changes to the risk factors described in Part I, Item IA, Risk Factors of our Form 10-K for the fiscal year ended January 29, 2022."

37.     In the Risk Factors of Target's 2021 Annual Report filed on Form 10-K, Target said the following regarding risks associated with its ESG/DEI initiatives:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate.  ***To be successful in the future, we must continue to preserve Target's reputation.***  Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target.  It may be difficult to ***control negative publicity***, regardless of whether it is accurate.  Target's responses to crises and ***our position or perceived lack of position*** on environmental, social and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation.  While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.  For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores.  If our guests have negative experiences with or

unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us.  Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties.

38.     Target's Form 10-Q for the fiscal periods ended July 31, 2022 and October 31, 2022 thus incorporated by reference the risk disclosure stated above and listed in Target's Form 10-K for the year ended January 31, 2022.

39.     This risk statement was false and misleading.  Target omitted that there were known risks associated with its ESG/DEI mandates generally, and LGBT issues specifically, including the risk of customer boycotts and harm to Target's financial results.

40.     Further, Target omitted to disclose that the Board was not monitoring or addressing those known risks.  Thus, its statements regarding "preserv[ing] Target's reputation" and "control[ling] negative publicity" were also misleading since Target was not, in fact, doing either with regard to its ESG and DEI initiatives.

41.     Item 105 required disclosure of the known risk of adverse customer reaction to Target's ESG/DEI initiatives and to the Campaign in particular, and Target failed to make these disclosures.

2.    Target's 2022 Annual Report

42.     Target filed its 2022 Annual Report on Form 10-K March 8, 2023. 2022 Annual Report at 68. Under the heading "Item 1A. Risk Factors," the Report purported to disclose "the material risks we face." *Id*. at 7.

43.     Unlike Target's 2021 Annual Report, the 2022 Annual Report made no mention of "ESG" or "DEI" in its discussion of reputational risks that could lead to "consumer boycotts." 2022 Annual Report at 8.  A comparison of the 2021 and 2022 Annual Reports are provided below, with the relevant removed language from the 2021 Report highlighted in red and underlined:

**2021 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions . . . It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and <u>our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation.</u> While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.

**2022 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation.

The 2022 Annual Report also provides no disclosure of ESG/DEI backlash as a "negative incident" that could result in consumer boycotts.

44.    Also, unlike the 2021 Annual Report, the 2022 Annual Report made no mention of risks associated with Target's ESG/DEI mandates.  Instead, the 2022 Annual Report stated the opposite: that the only risks stemming from Target's ESG/DEI mandates came from Target failing to adequately "achieve" such mandates. The 2022 Annual Report provided:

> [S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet

10

> evolving and varied stakeholder expectations could adversely affect
> our reputation and result in legal and regulatory proceedings against
> us.

45.     These statements were incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023, August 25, 2023, and November 22, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 Annual Report.

46.     These disclosures were false and misleading. Target's 2023 LGBT-Pride Campaign was just two months away, yet it failed even to mention the risk of adverse customer reactions and shareholder reactions. The 2023 LGBT-Pride Campaign was an ESG/DEI mandate that subjected Target to the risk of customer boycotts.

47.     At the time Target issued the 2022 Annual Report, Target employees were planning and beginning to implement the 2023 LGBT-Pride Campaign. Target management knew of the planned Campaign.

48.     These statements were false and misleading because they omitted to disclose the known risks associated with its 2023 LGBT-Pride Campaign, which was launched in May 2023. The risks included, among other things, alienation of Target's core customer base, customer boycotts, negative press, and a negative effect on Target's reputation. If these risks materialized, which they did, Target was subject to a decline of revenue and profits.

49.     Target management was aware of these risks. Those risks had in fact materialized following Target's response to the North Carolina transgender law, which led to customer boycotts, and following incidents of consumer backlash to previous pride month displays. Target's management thus had first had experience with the negative outcomes associated with its stance on LGBT issues.

50.     Nonetheless, Target failed to disclose the risk that its ESG/DEI initiatives could harm its reputation, let alone disclose any information about the upcoming 2023 LGBT-Pride Campaign in its 2022 Annual Report.

           3.      Target's Form 10-Q for the Period Ended April 29, 2023

51.     On May 26, 2023, Target filed its Form 10-Q for the period ended April 29, 2023. Under the heading "Risk Factors," Target incorporated by reference the risk factor cited above in paragraphs 43 and 44, *supra*, when it stated: "There have been no material changes to the risk factors described in Part I, Item 1A, Risk Factors of our Form 10-K for the fiscal year ended January 28, 2023."

52.     This statement was false and misleading because the risk disclosure in the Form 10-K for the fiscal year ended January 28, 2023, omitted to disclose the known risks associated with its 2023 LGBT-Pride Campaign, which was launched in May 2023.  The risks included, among other things, alienation of Target's core customer base, customer boycotts, negative press, and a negative effect on Target's reputation.  When these risks materialized, Target was subject to a decline of revenue and profits.

**B.**     **Defendants Cornell and Target Concealed the Consumer Backlash to the 2023 LGBT-Pride Campaign**

53.     Shortly after calls for consumer boycotts began, Target took certain remedial measures to reposition certain LGBT-themed merchandise in less prominent locations in retail locations.  On May 24, 2023, Target issued a statement entitled, "Target Statement on 2023 Pride Collection," which is accessible on its website at: https://corporate.target.com/press/statement/2023/05/24/target-statemetn-on-2023-pride-collection.  It states:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month.  Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work.  Given these volatile

circumstances, we are making adjustments to our plans, including removing items that have been at the center of the most significant confrontational behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.

54.     This statement was false and misleading. It omitted to disclose that the reason Target removed LGBT-Pride related merchandise was because it caused consumer backlash and boycotts that harmed Target's sales and related financial metrics. This was later revealed by Defendant Cornell and other Target executives when they admitted that Target's 2023 LGBT-Pride Campaign was too prominent, and thus pledged that future campaigns would be less prominent in Target's stores.

### C.     Target's 2023 Proxy Falsely Touted Its Oversight of "Social and Political Issues and Risks" to Target's ESG/DEI Initiatives

55.     In Target's 2023 Proxy, Target assured investors that the Board monitored "social and political issues and risks" arising from the company's ESG mandates. In reality, the Board—both itself and through the applicable Board committees—oversaw only the risks Target perceived from *failing to achieve Target's ESG and DEI mandates*, risks which are not social or political under Target's own definition and a common-sense interpretation of "social and political issues and risks."

### 1.     Relevant Statements in Target's 2023 Proxy

56.     Target filed its 2023 Proxy with the SEC on May 1, 2023. *See* 2023 Proxy at 6. The 2023 Proxy described the Board's key role in risk oversight:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.

**The Board and its Committees**

The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

2023 Proxy at 14.

57.    The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight and described the Board's allocation of oversight of those matters throughout the Board and its committees:

**Sustainability & ESG**

We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:

**Board**

- Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
- Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)
- Reputation management
- Crisis management and response

***

14

**Audit & Risk Committee**

- Supply chain ESG matters, including vendor human capital and responsible sourcing practices

\*\*\*

**Governance & Sustainability Committee**

- Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)

\*\*\*

- Social and political issues and risks not allocated to other Committees
- Philanthropy and community engagement
- Policies and practices regarding public policy advocacy and political activities

2023 Proxy at 15–16.

58.    While the 2023 Proxy was clear that each of Target's Board, the Audit & Risk Committee, and the Governance & Sustainability Committee were responsible for oversight of various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social" and "political" issues and risks.

59.    In discussing the Board Committees' roles in "fulfilling the oversight and other responsibilities delegated by the Board," the 2023 Proxy also referenced Target's "Board Committee Charters" and directed shareholders to "current cop[ies]" of such charters "available on Target's website." 2023 Proxy at 12, 78.

60.    The Board's Governance & Sustainability Committee Charter further described the Committee's ESG and political and social risk oversight responsibilities:

> **ESG & Corporate Responsibility Matters.** Oversee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters, including:
>
> \*\*\*

15

- identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;

\*\*\*

- *social and political issues and risks impacting the Corporation* (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);
- the Corporation's philanthropy and community engagement activities;
- external reporting on ESG and corporate responsibility matters

**Public Advocacy and Political Activities.** Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

Target Governance & Sustainability Committee Charter at 2–3 (emphasis added).

61.     The Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is separate its other responsibilities, including the oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even "public advocacy and political activities."

    2.    <u>Target's 2023 Proxy Represented that the Board Oversaw Social and Political Risks Arising from Backlash to its ESG/DEI Initiatives</u>

62.     The 2023 Proxy's representation that the Governance & Sustainability Committee oversaw the "social and political issues and risks" of Target's ESG matters were false and misleading.  Rather than overseeing social and political issues and/or risks arising from Target's ESG matters, the Governance & Sustainability Committee oversaw Target's engagement with "stakeholders" to advance ESG/DEI-aligned goals.

63.     The Governance Committee preceded the Governance & Sustainability Committee. *See* Target, 2022 Proxy Statement and Notice of Annual Meeting of Shareholders at 63 (June 8, 2022) (the "2022 Proxy") (describing the position of Governance & Sustainability Committee as "formerly Governance Committee Chair"); *id.* at 75 (erroneously still referring to the nomination of director candidates to the Governance & Sustainability Committee as the "Governance Committee").

64.     The Governance Committee lacked express oversight responsibility for social and political issues and risks created by ESG matters.

65.     The Governance Committee "[a]ddresse[d] ESG topics on a consolidated basis by allocating responsibilities for ESG topics among the Board and its Committees . . . and [by] overseeing our overall approach to corporate responsibility." Target, 2021 Proxy Statement and Notice of Annual Meeting of Shareholders at 18 (June 9, 2021) (the "2021 Proxy"). It also oversaw management's responsibility to "instill ESG-related priorities into our business operations, including product design and development" and other business tasks.

66.     The Governance Committee's oversight responsibilities did not include any oversight of "risk," Target, Governance Committee Charter, and Target's previous proxy statements did not mention "risk" in the Governance Committee's ESG-oversight responsibilities. *See, e.g.*, 2021 Proxy at 18.

67.     The Governance & Sustainability Committee was established in September 2021 as part of the Board's overhaul of its committee structure. 2022 Target ESG Report at 56.

68.     The Governance & Sustainability Committee retained many of the previous Governance Committee's responsibilities, including to "[o]versee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters." Governance & Sustainability Committee Charter at 2.

69.     The Governance & Sustainability Committee was allocated the new responsibility to "oversee . . . *social and political issues and risks"* of Target's "ESG & Corporate Responsibility Matters." Governance & Sustainability Charter, *supra*, at 2–3 (emphasis added).  The 2023 Proxy also highlighted the Governance & Sustainability Committee's new ESG oversight responsibility.

70.     Target touted the new committee structure as a way for the Board to "enhance its approach to oversight of risk and ESG matters by reallocating to its committees oversight responsibility" for ESG and DEI matters. 2022 Target ESG Report at 56.

71.     The background to the Governance & Sustainability's ESG-risk oversight responsibilities and context of Target's intended alignment with corporate best practices supports the meaning of overseeing "social and political issues and risks" that includes the social and political risks of both adopting ESG/DEI mandates and failing to adopt them.

3.     Target's Board Did Not Oversee Social or Political Risks to ESG Matters

72.     Contrary to a reasonable investor's understanding of "social and political issues and risks", and unlike the boards of the companies discussed *supra*, Target's Board instead oversaw only the issues and risks arising from the perceived failure to achieve its ESG and DEI mandates.

73.     Rather than overseeing social and political issues and risks to protect shareholder interests by serving Target's customers, Target's Board and the Governance & Sustainability Committee instead focused on potential negative responses by "stakeholders" to Target's perceived failure to achieve ESG and DEI mandates.

74.     In the 2022 Annual Report (which Defendants caused Target to issue), Target elaborated on "stakeholder expectations"-driven ESG and DEI risk:

> *[S]takeholder expectations* regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. *Any failure, or perceived failure,*

*by us to achieve these goals and initiatives* or to otherwise meet
evolving and varied stakeholder expectations could adversely affect
our reputation and result in legal and regulatory proceedings against
us.

2022 Annual Report at 8 (emphasis added).

75.   Target's main concern regarding ESG-related risk was the failure to meet
"stakeholder expectations" concerning its ESG and DEI commitments which could adversely
affect the company.

76.   Risks arising from failure to meet "stakeholder expectations" are not "social or
political issues and risks."  "Stakeholder expectation" risk is a separate category of risk arising
from negative responses by the company's "stakeholders." Target's engagement with activists is
not oversight of "social or political issues or risks" arising from the adoption of ESG and DEI
commitments. The purpose of Target's engagements is to adopt and implement ESG and DEI
mandates regardless of the social or political issues or risks they create for Target.

77.   As evidenced by the Company's focus on "stakeholders" under its ESG risk
framework, the Governance & Sustainability Committee did not oversee social and political issues
and risks.

78.   The fact that Target engaged in the uniquely controversial 2023 LGBT-Pride
Campaign is evidence of the Board's lack of oversight of social and political issues and risks.

4.   Alternatively, Target's Board Only Oversaw Perceived Social or Political
     Risks to *Not* Adopting ESG Matters

79.   Even if the Board's focus on its "stakeholder expectations" and ESG/DEI risk
included oversight of social and political issues or risks, the Board's selective focus of issues only
associated with the political left rendered misleading the 2023 Proxy's representations that the
Board oversaw "social and political issues and risks."

80.    A reasonable investor would conclude that the Governance & Sustainability Committee's oversight of "social and political issues and risks" related to ESG matters would include *any* material risk related to Target's ESG mandates, whether from the failure to achieve ESG mandates or from the pursuit of ESG mandates.

81.    Target's instead oversaw only the issues and risks arising from Target's perceived *failure to achieve* its ESG and DEI mandates.

82.    Target further demonstrated its oversight of only left-wing ESG risks by engaging in an ideologically motivated campaign to restrict books on LGBT issues from a conservative perspective from its stores and other sales platforms. Target engaged in and continues to engage in this campaign for no rational purpose despite ongoing political backlash.

83.    Target's "stakeholders" skew heavily in a distinct and left-wing ideological direction and do not appear to include any culturally or socially conservative groups representative of the average Target shopper.

84.    Even if the phrase "social and political issues and risks" meant only left-wing, pro-ESG "issues and risks," the 2023 Proxy was still misleading because Target omitted to state the material fact that those were the issues that the Board viewed as material social and political issues and risks arising from Target's ESG mandates.

**D.    Target's 2023 Proxy Contained False and Misleading Statements That Target's ESG and DEI Initiatives Were Designed to Increase Shareholder Value**

85.    Target's 2023 Proxy asserted that the Board acted to advance shareholder interests across all Company transactions, including with respect to ESG/DEI mandates.

86.    The 2023 Proxy communicated that the Board "prefers to maintain the flexibility to determine which leadership structure best serves the interests of Target and our shareholders,"

2023 Proxy at 10, and would act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders," 2023 Proxy at 18.

87.     The 2023 Proxy also stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets."  2023 Proxy at 17.

88.     These representations were material because a reasonable investor would have understood these statements to clarify that, despite Target's commitment of significant business resources to ESG/DEI mandates, the Board and management remained focused on shareholder value.

89.     Those representations were false because Target's ESG and DEI mandates were formulated and enforced to serve collateral "stakeholder" interests.

90.     Target's DEI mandates did not contribute to Target's growth.  Target's 2023 Proxy stated that "growth was driven primarily by traffic growth as guests increasingly chose Target as a convenient, reliable one-stop shop."  2023 Proxy at 43.  In the 2022 Annual Report, Defendant Cornell attributed Target's strength in store traffic to its merchandising program, which was focused on consumer purchasing patterns.  2022 Annual Report at 5.  Nothing in these descriptions of Target's growth mentioned DEI.

91.     Analysts credit Target's growth before the 2023 LGBT-Pride Campaign to its e-commerce strategy and investments.  Target's "digital comparable sales grew 29% after leaping 155% in Q3 of 2020" while "Amazon's Q3 net sales grew 15% and Walmart's Q3 U.S. e-commerce sales grew 8%."  Kunal Chopra, What Target is Doing Right In the Pandemic Era E-Commerce Race?, *Forbes* (Feb. 3, 2022).  The report did not mention DEI.

92.     Target's Board and management delegated the implementation of Target's ESG and DEI mandates to Target officials who suffered from disabling personal conflicts of interest,

including with some of the very activists that Target partnered with in adopting and pursuing the ESG and DEI mandates.

93.    For example, Target senior executive Carlos Saavedra served as treasurer at GLSEN, and Target's Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, served on the Board of GLSEN. These positions imposed conflicting duties on those officers and precluded them from implementing Target's ESG and DEI mandates in good faith to advance shareholder interests.

94.    Target's chief diversity officer also indicated her personal commitment to advancing "racial equity" for its own sake, even if it was "provocative," and singled out "white women" for special obligations to this cause.

95.    This conduct indicates that the 2023 Proxy's statement that the Board oversaw Target's ESG and DEI mandates to advance shareholder interests was misleading because, in reality, the Board delegated the execution of these mandates to executives who could not advance shareholder value in good faith.

**D.    Target's Board Falsely Claimed Executive Compensation Plans Were Designed to Align with Shareholder Value**

96.    In seeking shareholders' approval of Target's executive compensation plans, the 2023 Proxy represented that the plans aligned executives' incentives with maximizing shareholder value when, in fact, the plans were designed to substantially incentivize executives to pursue DEI mandates.

97.    The 2023 Proxy outlined Target's "Executive compensation guiding principles," providing:

> We believe executive compensation should be *directly linked to performance and long-term value creation for our shareholders*. With that in mind, three principles guide our compensation program:
>
> - Deliver on our pay for performance philosophy in support of our strategy.
> - Provide a framework that encourages *outstanding financial results* and shareholder returns over the long-term.
> - Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.

2023 Proxy at 39 (emphasis added).  Target also attested that the executive compensation programs "align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 38.

98.    A reasonable investor would understand these representations to mean that Target's executive compensation was substantially aligned with advancing Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

99.    In reality, Target awarded substantial amounts of executive compensation based on its executives' "performance" of satisfying ambiguous and subjective DEI goals to the detriment of investors.

100.    In fact, substantial sums of executives' compensation were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.

101.    A footnote in the 2023 Proxy further explained that Target's executive compensation included a component ambiguously labeled "STIP" (an acronym the 2023 Proxy never defined, but which stands for "Short Term Incentive Plan").  2023 Proxy at 39.  The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance":

The following pay elements are performance-based and represent a significant percentage of Annual TDC:

- STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard.

*Id.* at 40.

102.    In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities." *Id.* at 41 (emphasis added).

103.    These statements were misleading and deceptive based on a final section of the 2023 Proxy that was buried below the initial declaration that executive compensation was aligned with shareholder value.

104.    Under a heading titled "Fiscal 2022 team scorecard assessment," the 2023 Proxy described that the "team scorecard component of the STIP . . . emphasized the business outcomes we expect from the execution of strategic priorities." *Id.* at 44. Those priorities, or "specific team scorecard progress indicators," included that executives "advance[d] progress on our new three-year enterprise DE&I goals." *Id.* at 44. Target's DEI goals were not mentioned in the guidelines for executive compensation.

105.    This conflicting information in the 2023 Proxy rendered Target's representation that its executive compensation was aligned with shareholder value misleading.

## VII.    RULE 10B-5 SCIENTER AND RULE 14A-9 NEGLIGENCE ALLEGATIONS

106.    Defendants were negligent in issuing the foregoing false and misleading statements in violation of Section 14(a) of the Exchange Act. Defendants were aware, or should have been aware, of red flags pertaining to Target being subject to harm caused by consumer backlash to its ESG/DEI mandates. Defendants were on notice that Target was subject to risk due to its activism on LGBT political issues because Target had been the subject of a large customer boycott that was

organized following Target's response to the North Carolina transgender bathroom law, another LGBT political issue.

107.    The facts pleaded herein establish the relevant Defendants' required states of mind for pleading violations of Rule 10b-5.

### A.    Defendant Cornell

108.    Defendant Cornell was motivated to mislead investors about the risks associated with Target's ESG/DEI mandates because his compensation was partly based on Target's advancement of ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.

109.    Defendant Cornell's signing of the 2019 Business Roundtable Statement demonstrated his awareness that he and Target were committed to "stakeholder" benefits that excluded oversight of social and political risks of backlash to such stakeholder benefits. Knowing that both he and Target would manage Target to benefit "stakeholders," Defendant Cornell knew that he, Target, and the Board would fail to oversee risks from groups excluded from Target's definition of "stakeholders."

110.    Defendant Cornell was also aware that he and Target's Board did not oversee risks of backlash to Target's ESG/DEI mandates because he viewed those mandates as part of his role and implemented them for their social value regardless of risk.

111.    Defendant Cornell knew Target was subject to customer backlash from its activism on LGBT political issues because he served on the Board and as CEO during Target's 2016 response to the North Carolina transgender bathroom law, during which he admitted Target "didn't adequately assess risk," causing consumer backlash that caused Target significant losses. More than 1.5 million customers vowed to boycott Target as a result of Target's opposition to the bathroom law.

112.    Defendant Cornell knew of the risk of customer backlash to Target's ESG and DEI activism. As CEO, Defendant Cornell was privy to Target positions on ESG and DEI matters and their effect on the company.

113.    Defendant Cornell admitted his awareness of "backlash" to corporate "social justice" efforts. An interview with Defendant Cornell published May 17, 2023 provided the following:

[Interviewer 1]: What's your take on some of the pushback now on you know, so called "woke" capitalism ... We saw so many CEOs like yourself stand up during this really challenging time in our society, when a lot kind of bubbled to the surface. ... We saw a lot of statements, a lot of partnerships sparked different programs and initiatives. **And now we're seeing a lot of backlash, not just on the social justice side, but kind of woke capitalism in general**. What is your take on it? How do you approach it? How do you answer those criticisms?

[Defendant Cornell]: You know, I start every day thinking about our company purpose and our company culture. So when we think about purpose at Target, it's really about helping all the families, and that "all" word is really important. How to discover that little bit of joy in everyday life. Our brand is all about delighting and taking care of the families we serve, and all those families, most of America shops at Target. So we want to do the right thing to support families across the country. **And when it's true to our purpose and true to our culture, we lean in. And I'm really proud of the work we've done in the DE&I space**. Now, the fact that we talked about almost 2,000 stores, well, half of those stores are run by female store directors. Over 40% of our store directors are diverse. That component is so important, but it also reflects the consumer we serve. And when your team, your leadership represents the consumer you serve, I think good things happen. So I can see the benefits for our shareholders. **I know that focus on diversity and inclusion and equity has fueled much of our growth over the last nine years.** But when you walk into a store and you feel at home, and it represents the community, it makes a huge difference. . . **I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand.**

[Interviewer 2]: Okay, but Brian, that was very compelling. You gave a very compelling answer to Michal's question without saying anything about politics or politicians. But what we're talking about is a political movement here that's trying to take what you just

described, and turn it into a wedge issue. **You exist in the political world. How do you deal with that?** Do you just do what you just did there and stay out of it? How do you deal with what's happening in politics?

[Interviewer 1]: I should point out you're in Florida right now. Good thing you're not with Disney. But still?

. . .

[Defendant Cornell]: I go back to, we start with what's right for the company purpose and that focus on families. We think about what's right for our team, and what's consistent with our culture. And Alan, when we do that, I think we make really good decisions. And we add value for our shareholders. And that's part of why we've seen explosive top-line growth. So, I think the facts are in, the results for us, and the things we've done from a DE&I standpoint, it's adding value, it's helping us drive sales, it's building greater engagement with both our teams and our guests. And those are just the right things for our business today.

Fortune Editors, "Target CEO: DEI Has 'Fueled Much of Our Growth Over the Last 9 Years,'" *Fortune* (May 17, 2023).

114.    Defendant Cornell was aware of the "teams working on Pride" prior to the campaign's launch.  Given the 2023 LGBT-Pride Campaign's content, Defendant Cornell would have been aware of the risks of consumer backlash to the campaign.

115.    Defendant Cornell knew about the Board's lack of oversight of ESG/DEI risk because he managed a senior executive team that pushed the 2023 LGBT-Pride Campaign without regard for those risks.

116.    Defendant Cornell also acknowledged his awareness of the heightened risk of consumer backlash to the 2023 LGBT-Pride Campaign because of the increasingly hostile consumer environment for LGBT marketing strategies. Defendant Cornell stated he was aware that Target made the 2023 LGBT-Pride Campaign "prominent in an environment where people had points of view" against LGBT marketing strategies like the campaign. CNBC Transcript,

"Target CEO Brian Cornell Speaks with Becky Quick from the CNBC Evolve Global Summit,"
*CNBC* (Nov. 2, 2023).

### B.    Defendant Target

117.    Defendant Target knew by and through Defendant Cornell, who was responsible
for making the false and misleading statements detailed herein, that Target was subject to the
material risk of consumer boycotts in response to Target's ESG/DEI mandates and the 2023
LGBT-Pride Campaign; that Target's Board did not oversee those risks; that Target was not being
managed to advanced shareholder value; and that Target's executive compensation was not aligned
with shareholder value.

## VIII.    RULE 10B-5 LOSS CAUSATION

118.    Plaintiff was damaged as a result of Defendants' misleading statements.  From the
start of the Class Period, through present, Target's stock price *is down 13%,* while its main rival
and peer, Walmart, *is up 125%.*  Likewise, the S&P 500 Index is up 50% during this same time
frame.  The bulk if not entirety of the underperformance began after the backlash from the DEI
initiatives in May 2023 and continue to present.

119.    The declines in Target's stock price beginning May 17, 2023, including, but not
limited to, the declines summarized below, are directly attributable to the market absorbing
information correcting Defendants' misrepresentations and omissions and/or the materialization
of risks concealed by Defendants from Target's investors and shareholders.

120.    Plaintiff suffered substantial economic losses as the price of Target's stock fell in
response to the issuance of partial corrective disclosures and/or the materialization of risks
concealed by the Defendants from Target's investors and shareholders. The following corrective
disclosures caused Target's stock to drop, thereby damaging investors, are representative, not
exclusive, of the partial corrective disclosures and/or the materialization of concealed risks that
led to Plaintiff's damages for which relief is sought in this matter.

121.    During the Class Period, as detailed herein, Plaintiff and the Class purchased Target common stock at artificially inflated prices and were damaged thereby.  The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Target common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

A.    **Losses Suffered During and in the Immediate Wake of the 2023 LGBT-Pride Campaign**

122.    The large, protracted consumer boycotts staged in response to Target's 2023-LGBT Pride Campaign served as corrective disclosures and/or risk materialization events that revealed (i) risks to Target from its ESG/DEI initiatives, (ii) risks to Target from the 2023 LGBT-Pride Campaign, (iii) the Board's lack of oversight of these risks, (iv) the true motives underlying the Board's adoption of its ESG/DEI initiatives, *i.e.*, not to enhance shareholder value, and (v) repeating material consumer backlash.

123.    On May 18, 2023, the American Family Association, one of the leading organizations supporting the boycott, published a blog post encouraging consumers to "officially join with the 1.57 million others who have pledged to boycott Target." Monica Cole, "Target Indoctrinates Youth," *Am. Fam. Assoc*. (May 18, 2023). Target's stock began its record decline that same day.

124.    Additional partial corrective disclosures occurred through Defendants Cornell and Target statements made on May 24, 2023 that admitted controversy surrounding the 2023 LGBT-Pride Campaign. However, these statements downplayed the scope and intensity of the consumer backlash to the Campaign, and impaired the market's ability to process information about the backlash and prolonged the period of the corrective disclosure.

125.    The price of Target's stock declined from $160.96 at the market close on May 17, 2023 to $124.12 at the market close on June 14, 2023.

126.    In stark contrast, Target's peers saw their stock prices increase during the same period.  For example, from May 17, 2023, to June 14, 2023, Walmart common stock (NYSE: WMT) increased from a price of $149.53 to $156.87 and Costco Wholesale Corporation (NASDAQ: COST) saw its common stock increase from $495 to $527.20 over the same period.

**B.    The Disclosure of Target's Q2 2023 Earnings Report Release and Investor Call**

127.    Defendant Cornell and other executives revealed additional information about the scope and effect of the consumer backlash to the 2023 LGBT-Pride Campaign on Target's Q2 2023 Earnings Report call on August 16, 2023. On the earnings call, Defendants and other Target executives revealed that the 2023 LGBT-Pride Campaign harmed the company's earnings and other financial metrics.  Defendants also revealed that Target's removal and relocation of LGBT Pride-themed merchandise aimed to mitigate the strategic errors Target made with the 2023 LGBT-Pride Campaign rather than just respond to isolated threats.

128.    From the day before the Q2 2023 earnings report release, August 15, 2023, to October 6, 2023, Target stock fell from closing prices of $125.05 to $105.01 per share.

**C.    Losses After the Disclosure of Target's Q3 2024 Earnings Report Release and Investor Call**

129.    On November 20, 2024, before the market opened, Target announced its quarterly results for the third quarter of 2024.  The Company announced that its GAAP-adjusted earnings per share were $1.85, compared with $2.10 in the same quarter of 2023, a decline of 11.9%.  The Company also reported disappointing guidance, including "approximately flat comparable sales."

130.    This news caused the price of Target's stock to drop precipitously, from a close of $156 on November 19, 2024 to a close of $121.72 on November 20, 2024, a decline of 22%.  The stock declined 22% in one-day, wiping out $16 billion in market cap. Target reported disappointing

earnings and guidance, as it continued to grapple with lingering effects of its ill-advised DEI campaigns that turned away customers, and apparently some customers for good. Notably, Target's performance was in stark contrast to its main rival Walmart that provided stellar performance during this same time frame. These losses resulted from further materializations of the risks associated with Target's LGBT and pride campaigns.

## IX.    RULE 14A-9 TRANSACTION AND LOSS CAUSATION

### A.    Transaction Causation: Shareholders' Re-election of Directors on the Basis of False Statements Regarding ESG-Risk Management Competencies

131.    As a result of false and misleading 2023 Proxy, Target shareholders voted to reelect the Directors to the Board.

132.    The re-election of Target's Directors in 2023 was an essential link in causing the 2023 LGBT-Pride Campaign and the resulting losses to Plaintiff and other Target shareholders.

133.    The 2023 annual meeting was held on June 14, 2023 (the "2023 Annual Meeting"), amid the 2023 LGBT-Pride Campaign customer backlash and during Target's lingering stock-price decline. The Target Board's purported oversight of social and political issues and risks was a central issue of the Directors' reelection.

134.    The 2023 Proxy called for Directors' re-election by expanding on the 2022 Proxy's attribute of "ESG Understanding" with an attribute labeled "ESG," which denoted the directors' "[e]xperience in strategies supporting sustainable long-term value creation or any matters included in our ESG priorities; actively supervising someone performing similar functions; or on a board of directors overseeing any matters included in our ESG priorities." 2023 Proxy at 22.

135.    The 2023 Proxy marked ten of the eleven independent directors with this new "ESG" attribute in calling for their re-election. *Id*. at 23.

136.    The 2023 Proxy's director skills and diversity matrix also notably updated its definition of "Reputation Management" to include "[e]xperience in . . . *crisis response*". 2023 Proxy at 22 (emphasis added).

137.    The 2023 Proxy also added language to each of the Defendants' biographies not previously included in Target's proxy statements, noting Defendants' skills that "enhanc[e] the Board's collective oversight capability." 2023 Proxy at 23–29.

138.    Instead of stopping the ongoing 2023 LGBT-Pride Campaign and attempting to reverse the damage caused by the Campaign, immediately after the Directors were reelected, Target continued the Campaign, causing further damage to Target's stock price and enabling continuing consumer backlash.

139.    While each of the director nominees was elected at the 2023 Annual Meeting, shareholder voting support for the all director nominees in the aggregate declined compared to the 2022 annual meeting.

140.    The election of the Directors to the Board enabled the 2023 LGBT-Pride Campaign by electing a Board that failed to oversee the Campaign's risks or mitigate those risks.

141.    The Directors' conduct in allowing the preparation of the 2023 LGBT-Pride Campaign and failing to oversee social and political issues and risks preceded and continued after their election to the Board at the 2022 annual meeting.

142.    Plaintiff and other investors would have voted against the re-election of Directors to the Board if they had been told the truth of the Board's allowing of the 2023 LGBT-Pride Campaign and lack of oversight of social and political issues and risks.

**B.    Transaction Causation: Shareholders' Rejection of Good-Governance Shareholder Proposals**

143.    As a result of Target's misleading 2023 Proxy, shareholders voted to reject good-governance proposals that would have increased board accountability and enabled enhanced

32

oversight of ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.  Specifically, the proposals considered would have allowed shareholders to more easily nominate candidates for election to the Board and separate the positions of CEO and Board Chairman currently combined and held by Defendant Cornell.

144.    Had Target been forthcoming about its Board's and Defendant Cornell's failures of risk oversight and had these proposals been adopted, Target would not have failed to oversee ESG/DEI risks.

145.    Specifically, the false and misleading 2023 Proxy caused Target shareholders to reject a proposal to separate the positions of CEO and Board Chairman (the "Independent Chairman Proposal").

146.    The Independent Chairman Proposal noted that Target had not yet adopted this corporate governance "best practice" and that Target's current arrangement allowed the Chairman/CEO to "ignore the advice and feedback" from independent directors, suggesting Target "does not take the role of lead director seriously."

147.    In recommending that shareholders vote against the proposal, the 2023 Proxy stated:

> The Board believes that its current leadership structure and governance practices provide effective, independent oversight without mandating a predetermined Board leadership structure . . . The Lead Independent Director role provides effective, independent leadership through its clearly defined and robust set of roles and responsibilities.

In reliance on the 2023 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

148.    This was also an essential link to the 2023 LGBT Pride Campaign because it permitted Defendant Cornell to maintain outsized influence over the Board, setting him to promote his agenda and prevent the Board's proper oversight of social and political issues and risks arising from his management's engagement in the 2023 LGBT-Pride Campaign.

149.     The Independent Chairman Proposal would have removed Defendant Cornell from the Board and thereby removed a chief source of Target's pro-ESG/DEI initiatives, allowing for improved oversight.

### C.     Separate and Independent Transaction & Loss Causation: Shareholders' Approval of Unauthorized and Excess Executive Compensation

150.     At the 2023 Annual Meeting, shareholders approved "Say on Pay" items for Target's executive compensation plan proposals in reliance on misleading statements and disclosures in the 2023 Proxy. At the meeting, shareholders approved the following resolution:

> Resolved, that the shareholders approve the compensation awarded to the NEOs, as described in the [Proxy Statement], tabular disclosures, and other narrative executive compensation disclosures in the 2023 Proxy Statement.

151.     Shareholders' approval of each executive compensation plan was an essential link in causing the 2023 LGBT-Pride Campaign and Plaintiff's losses resulting from it.

152.     The executive compensation plan approved by shareholders materially incentivized Target executives to advance Target's DEI goals, which the 2023 LGBT-Pride Campaign also advanced.

153.     For the executive compensation approved at the 2023 meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included Target's goal to "increase relevance with diverse guests" and "offer more products from diverse suppliers."

154.     Target's management, including Defendant Cornell, also would have reasonably expected that engaging in the 2023 LGBT-Pride Campaign would improve their outcomes under the Team Scorecard for DEI progress, and thereby materially increase their compensation.

155.     The shareholder approval of the executive compensation plans in the 2023 Proxy, also authorized the execution of corporate spending that caused an independent harm to Target and

Target shareholders by paying Target Named Executive Officers ("NEOs") unauthorized compensation and excess compensation.

156.    In reliance on the misleading executive compensation disclosures, Target paid executives (including Defendant Cornell) compensation that was not validly approved by shareholders. At the 2023 Annual Meeting, Target shareholders approved over $36.9 million in compensation to Target NEOs.

157.    In the 2023 executive compensation plan, executives received over $1.5 million in STIP payouts for the "team scorecard component" that included progress on DEI goals.

158.    Target secured shareholder approval of these sums via misleading proxy statements that tainted the shareholder approval process and renders these amounts unauthorized by shareholders.

159.    The payment by Target of such unauthorized and excess sums harmed Target shareholders, including Plaintiff, by interfering in Target's proper corporate governance, wasting corporate assets, and incentivizing value-destroying behavior by Target's executives.

### D.    Loss Causation

160.    The election of the Directors to the Target Board, coupled with the unauthorized payment of executive compensation, damaged investors by causing further stock price declines. Specifically, because the 2023 Proxy contained misleading statements, investors elected a Board that failed to exercise proper oversight of the 2023 LGBT-Pride Campaign and associated risks. The result of this was that the Company's reputation was damaged, and customers boycotted the Company. These events, in turn, resulted in a steady decline of the price of Target's stock price from May 16, 2023 (when the stock price closed at $160.90) to October 6, 2023 (when the stock price closed at $105.01). If a Board had been elected that was prepared to exercise proper oversight of the

risks associated with the 2023 LGBT-Pride Campaign, Target's stock price would not have declined throughout this period.

161. Further, rather than stop the 2023 LGBT-Pride Campaign, in the face of obvious customer backlash, Target enacted another pride campaign in 2024. Target continued to market and sell LGBT-themed content.

162. On May 31, 2024, Target issued a press release stating that "we support and celebrate LGBTQIA+ community during Pride Month and year-round." The press release specified the various ways it was "celebrating during Pride Month and throughout the year:"

163. Customers never returned to Target following the 2023 and 2024 pride campaigns. Target continued to suffer from declining demand and weak revenues. On November 20, 2024, Target announced that its GAAP-adjusted earnings per share were $1.85, compared with $2.10 in the same quarter of 2023, a decline of 11.9%. The Company also reported disappointing guidance, including "approximately flat comparable sales."

164. This news caused the price of Target's stock to drop precipitously, from a close of $156 on November 19, 2024 to a close of $121.72 on November 20, 2024, a decline of 22%.

## X.    CLASS ACTION ALLEGATIONS

165. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Target common stock between August 26, 2022 and November 19, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

166. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Target's shares actively traded on the NYSE. While

the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Target shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Target or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

168.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and prospects of Target;

(c) whether Defendants acted with the requisite state of mind for each count alleged; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

171.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false, and/or the forward-looking statement was authorized or approved by an executive officer of Target who knew that the statement was false when made.

## XII.    PRESUMPTION OF RELIANCE

172.    The market for Target's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false statements, Target's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Target's common stock and market information relating to Target, and have been damaged thereby.

173.    During the Class Period, the artificial inflation of Target's stock was caused by the material misrepresentations particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false statements about Target's business, prospects, and operations. These material misstatements created an unrealistically positive assessment of Target and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

174.    At all relevant times, the market for Target's common stock was an efficient market for the following reasons, among others:

(a) Target shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Target filed periodic public reports with the SEC and/or the NYSE;

(c) Target regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Target was followed by common stock analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and

certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

175. As a result of the foregoing, the market for Target's common stock promptly digested current information regarding Target from all publicly available sources and reflected such information in Target share price. Under these circumstances, all purchasers of Target's common stock during the Class Period suffered similar injury through their purchase of Target's common stock at artificially inflated prices and a presumption of reliance applies.

## XIII.    CAUSES OF ACTION

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and**
**SEC Rule 10b-5 Against Defendants Target and Cornell**

176. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

177. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Target's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

178. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Target's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

179. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Target's financial well-being and prospects, as specified herein.

180.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Target's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts about Target and its business operations and future prospects, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

181.    Defendant Cornell's primary liability and controlling person liability arises from the following facts: (i) Defendant Cornell was the CEO of the Company during the Class Period and had complete control over the Company's public statements and filings; (ii) Defendant Cornell was privy to, and in fact personally directed the creation and reporting of the Company's public filings, including its financial metrics; and (iii) Defendant Cornell was aware of the Company's dissemination of false information to the investing public which they knew and/or recklessly disregarded was materially false.

182.    Defendant Cornell had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him.  Defendant Cornell knowingly and/or recklessly made material misrepresentations for the purpose and effect of concealing Target's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendant Cornell's misstatements of the Company's business, operations, financial well-being, and prospects

throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false.

183.    Defendant Cornell signed and Defendant Target issued the misleading 2022 Annual Report and 2023 Proxy.  As a result of the dissemination of the materially false information, as set forth above, the market price of Target's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false statements made by the Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Target's common stock during the Class Period at artificially high prices and were damaged thereby.

184.    At the time of said misrepresentations, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Target was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Target common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

185.    By virtue of the foregoing, Defendants Target and Cornell violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

186.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

187.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

188.    Defendant Cornell was a controlling person of Target within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his position as CEO of the Company, and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendant Cornell had the power to influence and control and did influence and control, directly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false.  Defendant Cornell was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be false prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

189.    In particular, Defendant Cornell had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the common stock violations as alleged herein, and exercised the same.

190.    The Individual Defendants, including Defendant Cornell, had and exercised the power to control the general affairs of Target, participated in the management and operation of

43

Target, and conducted and participated, directly and indirectly, in the conduct of Target's business affairs.

191.    Because of their senior positions, the Individual Defendants knew the adverse non-public information about the 2023 LGBT-Pride Campaign and the Board's failure to oversee it and the social and political risks that Target's proxy statements proclaimed the Board oversaw.

192.    As directors, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Target's governance and operations, and to correct promptly any proxy statements issued by Target that were or had become materially false or misleading.

193.    Because of their positions of control and authority as directors, the Individual Defendants were able to, and did, control the contents of the 2023 Proxy Target disseminated in the marketplace during the Class Period.  The Individual Defendants exercised their power and authority to cause Target to engage in the loss-causing acts complained of herein.

194.    The Individual Defendants were controlling persons of Target within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the conduct alleged which artificially inflated the market price of Target common stock.

195.    Each of the Individual Defendants acted as a controlling person of Target and had the power to direct the actions of, and exercised the same to cause, Target to engage in the unlawful acts and conduct alleged herein.

196.    Each of the Individual Defendants exercised control over the general operations of Target and possessed the power to control the specific activities which comprise the violations alleged herein.

197.    As set forth above, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for violations committed by Target. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's

common stock during the Class Period.

**COUNT III**
**For Violations of Section 14(a) of the Exchange Act**
**and SEC Rule 14a-9 Against All Defendants**

198.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

199.    Plaintiff brings this claim as a direct claim against Defendant Target and the

Individual Defendants, including Defendant Cornell, for violation of Section 14(a) of the

Exchange Act and Rule 14a-9 promulgated thereunder.

200.    Rule 14a-9 (17 C.F.R § 240.14a-9), promulgated under § 14(a) of the Exchange

Act, provides:

> No solicitation subject to this regulation shall be made by means of
> any proxy statement, form of proxy, notice of meeting or other
> communication, written or oral, containing any statement which, at
> the time and in the light of the circumstances under which it is made,
> is false or misleading with respect to any material fact, or which
> omits to state any material fact necessary in order to make the
> statements therein not false or misleading or necessary to correct any
> statement in any earlier communication with respect to the
> solicitation of a proxy for the same meeting or subject matter which
> has become false or misleading.

201.    The Individual Defendants caused to be issued and Defendant Target issued the

misleading 2023 Proxy soliciting shareholder votes on their behalf.

202.    When Plaintiff purchased the stock and throughout the period of his ownership, the

Individual Defendants and Target disseminated the false and misleading 2023 Proxy, which made

false and misleading statements of material facts and which failed to state material facts necessary

to make the statements that were made not misleading in violation of Section 14(a) of the Exchange

Act and Rule 14a-9.

203.    As a result of the Defendants' preparation, review, and dissemination of the 2023 Proxy, Plaintiff has suffered substantial harm.

204.    Because of such misconduct, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and Rule 14a-9.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Declaring that Defendants Cornell and Target violated Section 10(b) and Section 14(a) of the Exchange Act; and that Defendant Cornell violated Section 20(a) of the Exchange Act;

(c)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)    Such other and further relief as the Court may deem just and proper.

## XV.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 31, 2025                    Respectfully Submitted,

*/s/ Joshua E. Dubin*
Joshua E. Dubin (Florida Bar #48865)
**Josh Dubin, P.A.**
201 South Biscayne Boulevard
Suite 1210
Miami, Florida 33131
Tel.: (212) 219-1469
Fax: (212) 219-1897
Email: josh@jdubinlaw.com

*Liaison Counsel for City of Riviera Beach Police Pension Fund*

/s/ *Jay W. Eisenhofer*
Jay W. Eisenhofer (pro hac vice forthcoming)
Caitlin M. Moyna (pro hac vice forthcoming)
Vincent J. Pontrello (pro hac vice forthcoming)
**GRANT & EISENHOFER P.A**.
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: jeisenhofer@gelaw.com
Email: cmoyna @gelaw.com
Email: vpontrello@gelaw.com

*Counsel for City of Riviera Beach Police Pension Fund*

**CERTIFICATION OF CITY OF RIVIERA BEACH POLICE PENSION FUND**

I, Michael Brown, on behalf of the City of Riviera Beach Police Pension Fund ("Riviera Beach Police") certify pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4 as follows:

1.      I am Chairman of the Riviera Beach Police, and I have fully reviewed the Class Action Complaint for Violations of the Federal Securities Laws and authorize its filing.  I am duly authorized to make this certification.

2.      The Riviera Beach Police did not purchase or acquire Target Corporation common stock at the direction of counsel or in order to participate in any private action.

3.      The Riviera Beach Police is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.      Attached as Schedule A to this Certification is a list of the Riviera Beach Police's transactions during the relevant period in the common stock that is the subject of this matter.

*5.*      During the three-year period preceding the date of this certification, the Riviera Beach Police has not sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws.

6.      The Riviera Beach Police will not accept any payment for serving as a representative party on behalf of the proposed beyond its pro rata share of any recovery, except as ordered or approved by the court.


[signature page follows]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and accurate.

Executed this <u>27th</u> day of January, 2025.

_____

Michael Brown, Chairman
*City of Riviera Beach Police Pension Fund*

**Target Corporation -- Schedule A**
**Riviera Beach Police Pension  Fund**

**Cusip:**          87612E106
**Ticker:**         TGT
**Class Period:**   August 26, 2022 through November 19, 2024

| Purchases | | |
|---|---|---|
| **Trade Date** | **Quantity** | **Price** |
| 10/04/22 | 558 | $156.21 |
| 11/01/22 | 523 | $164.68 |

| Sales | | |
|---|---|---|
| **Trade Date** | **Quantity** | **Price** |
| 01/04/23 | 8 | $154.08 |
| 03/28/23 | 5 | $159.77 |
| 05/25/23 | 11 | $140.75 |
| 08/01/23 | 1,057 | $133.54 |