**Declaration of Rajeev R. Bhattacharya, Ph.D.**

Rajeev R. Bhattacharya, Ph.D. hereby declares and says as follows:

## A. Qualifications

1. I have three decades' research, consulting, management, and teaching experience in finance, economics, and Big Data. I am the president of Washington Finance and Economics and have worked in senior roles at leading consulting firms including the Berkeley Research Group. I have served on the full-time faculty of the University of Maryland, Georgetown University, Washington University in St. Louis, and the University of New South Wales, and on the part-time faculty of Johns Hopkins University, George Mason University, and George Washington University. I have recently been given the unique honor of an honorary professorship at Macquarie University in Sydney, Australia.

2. I received my Ph.D. in economics from the University of Rochester in 1995. I was nominated for the *Donald M. Ephraim Prize in Law and Economics*, University of Chicago Law School, 2024, and have been declared an *Outstanding Researcher* by the U.S. Federal Government.

3. My primary expertise is in the application of the frontiers of quantitative methods to stocks, bonds, and derivatives, especially with event studies. I have recently presented my original research at twelve academic seminars at leading institutions and the U.S. Securities and Exchange Commission, using high-frequency intraday equity, fixed income securities, and derivatives data that consists of hundreds of trillions of observations and comprise over 25 TB of data. In my book, *[Advanced Analytics for Finance: Theory and Empirics Using Big Data](#)*, 2025 (forthcoming), Cambridge University Press (one of the world's leading

producers of university textbooks), Chapter 1 details the scientific method and the supremacy of truth; the other chapters are on the applications of purely objective, scientific methods to questions in finance that are particularly pertinent to securities litigation. I also have many highly-regarded publications in top finance journals, including a number of articles profiled on the website of the Stanford Securities Class Action Clearinghouse.

4. I have been a testifying expert on a number of matters, including the level of efficiency of the market for a stock and its implications for the use of market price as an approximation for value; harm to investors under allegations of securities manipulation; measuring harm as a result of delays in delivery of options, warrants and other derivatives; class certification and damages in a class action; tying and price fixing; the impact of alleged vertical foreclosure on price, quantity and quality; violation of intellectual property; and profits lost by a retailer due to directory error.

5. My firm is being compensated at the rate of $1,000 per hour for my time on this matter plus expenses. Our compensation does not depend on the outcome of this matter or on my opinions.

## B. Even a "net seller" can have "net damages" because share price inflation is not constant across the class period.

6. It is extremely naïve, and not supported by the frontiers of academic research, to assume a constant band of share price inflation across the entire Class Period, for the obvious reason that inflation per day is not constant for every day of the Class Period.

7. To develop more accurate estimates of share-price inflation in each day of the Class Period, a financial economist should utilize all the frontier-methodologies of traditional statistics and econometrics on one hand and artificial intelligence and machine learning on the other to estimate clean TGT prices per share **for every day** during the Class Period, and therefore, inflation per TGT share **for every day** during the Class Period.

8. Because share-price inflation varies across the class period, it is entirely possible that a net seller still experienced net damages from the fraud. Depending on the specifics of when the investor bought and sold shares and the share-price inflation at those specific times, a net seller can still suffer net damages, even after subtracting out the gains from selling shares at an inflated price.

9. Because those calculations will depend on data provided after discovery, it would be premature to conduct those calculations at this time.

## C.     Financial economics theory and practice would not focus on "net damages" anyway.

10. An investor can have multiple transactions with another investor or a set of investors. If Investor 1 was defrauded by having to pay, say, on March 3, 2022, a share price that was inflated because of these alleged frauds, then Investor 1's damage per share would be given by the difference between the actual price and the price that would have occurred absent the fraud.

11. Considering, for the sake of argument, that Investor 1 also sold some shares also at inflated prices on 6/4/22, that cannot take away from the damages that Investor 1 sustained because of her purchases at inflated prices. Such a theory of net "gain" attributed to an investor due

to fraud is fundamentally antithetical to the theory and practice of financial economics, and should therefore, be ignored in all damages calculations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

April 25, 2025

*RRBhattacharya*
―――――――――――――――――――
Rajeev R. Bhattacharya, Ph.D.